## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

CAROLINA CASUALTY INSURANCE
COMPANY,

     *Plaintiff/Counter-Defendant,*

v.

TRAVELERS PROPERTY CASUALTY
COMPANY, *counter-claimant, third party
plaintiff, cross-claimant, cross-
defendant*; ILLINOIS NATIONAL
INSURANCE COMPANY, *counter-claimant,
cross-defendant*; LEXINGTON INSURANCE
COMPANY, *counter-claimant, cross-
defendant*; OLD REPUBLIC INSURANCE
COMPANY, *cross-defendant,*

     *Defendants,*

v.

PENSKE TRUCK LEASING CO., L.P.
GARDNER, MASSON, BISHOP &
COMPANY, *counter-claimant, cross-
claimant, cross-defendant*; GARDNER M.
BISHOP, INC., *counter-claimant, cross-
claimant, cross-defendant*; MARK
ALBANESE, *counter-claimant, cross-
defendant*; JOSEPH PUCCIO, *counter-
claimant, cross-defendant*; JOHN
KANARD, *cross-defendant,*

     *Third Party Defendants.*

Civ. No. 09-4871 (KM)(MCA)

**OPINION**

**MCNULTY, U.S.D.J.:**

This is a declaratory judgment action among insurers. A tractor-trailer driver, severely injured in a loading accident, sued and obtained a $5 million settlement, which has been paid. This action seeks a declaratory judgment to settle the potentially responsible carriers' shares of the obligation to cover that $5 million award and the costs of defense. Before me now are four motions for summary judgment.

My ultimate allocation of the $5 million settlement is as follows:

| Primary Coverage | | Excess Coverage | |
|---|---|---|---|
| Travelers | $1,000,000 | Illinois National | $1,492,500 |
| CCIC | $1,000,000 | Lexington | $1,492,500 |
| Old Republic | $    15,000 | | |
| Primary Total   =   $2,015,000 | | Excess Total   =   $2,985,000 | |

## I.    FACTS

Gardner, Masson, Bishop & Company ("Gardner Bishop") was a general contractor for a New Jersey Turnpike construction project. Ho-Ro Trucking ("Ho-Ro") had a contract with Gardner Bishop to pick up concrete road barriers from a construction staging area and transport them to another location.

John Kanard was an employee of Ho-Ro Trucking. On September 28, 2007, Kanard drove a tractor[1] and attached flatbed trailer to the construction

---

[1]    I will refer to the front, towing-engine portion of the vehicle as the "tractor," the back, towed portion as the "trailer," and the entire vehicle as the "tractor-trailer." This may help avoid confusion arising from references to the entire tractor-trailer combination, or the front part thereof, as a "truck."

staging area. Ho-Ro owned the flatbed trailer. Ho-Ro leased the tractor from the owner, Penske Truck Leasing Co., L.P. ("Penske") (Travelers' R. 56.1 Statement at ¶¶8-9).[2]

Kanard parked the tractor-trailer at the staging area. Gardner Bishop employees began loading the 8,000-pound barriers onto the trailer, using an excavator outfitted with a specially designed clamp. (*Id.* at ¶9). Kanard was working with loading straps along the side of the trailer. (*Id.* at ¶12). One of the barriers fell, crushing and severing Kanard's left foot. (*Id.* at ¶¶10-13).

On August 18, 2008, Kanard sued Gardner Bishop and various other defendants, alleging seven counts of negligence relating to the loading process. (*Id.* at ¶¶17-19). Gardner Bishop's liability insurer, Travelers Property Casualty Company ("Travelers"), provided a full defense. That action settled for $5 million. (*Id.* at ¶30). Of that $5 million, Travelers paid $1 million (the limit of Travelers' policy). The remaining $4 million was paid by Illinois National Insurance Company ("Illinois National"), Gardner Bishop's excess liability insurer. (Illinois National's policy had a $10 million limit.) (*See id.* at ¶¶30-31).

---

[2]    There was some uncertainty on this point in the parties' initially filed L. Civ. R. 56.1. (*See* CCIC's R. 56.1 Statement ¶ 3)(Ill. Nat.'s R. 56.1 Statement ¶ 5)(Travelers' R. 56.1 Statement ¶¶ 7-8) (Old Rep. and Penske's R. 56.1 Statement ¶ 4). The evidence demonstrates, however, and no one now seems to dispute, that Ho-Ro owned the trailer and leased the tractor from Penske. Penske and CCIC submitted a 2007 lease between Ho-Ro and Penske, which included in its schedule of covered vehicles a 2007 Freightliner truck. (ECF No. 93, Attorney Cert. at Ex. B). Penske acknowledges that it "leased a 2007 Freightliner Columbia Tractor to Ho-Ro on or about May 23, 2007…Mr. Kanard delivered the concrete barriers utilizing a trailer owned by Ho-Ro and a tractor owned by Penske." (Penske and Old Republic's Statement of Facts, Brief at 3 [ECF No. 93-3]). The tractor at the accident scene was a 2007 Freightliner. It bore Ho-Ro's name, but it had Indiana plates, and Ho-Ro produced "an Indiana Registration Cab Card for one 2007 power unit…operated by Penske Truck Leasing Co LP in Ft. Wayne, Indiana, under Penske's US DOT Motor Carrier No. 327574." (Declaration of Deborah Metzger Mulvey, Esq. on the Subject of Vehicle Status [ECF No. 98-1] at ¶¶ 2-3, 5). The flatbed trailer also had Ho-Ro's name on it, but it had New Jersey plates and registration, and "partial title" in Ho-Ro's name. (*Id.* at ¶¶ 2, 7; *see also* NJMVC Registration Card and Title for Trailer, in Ho-Ro's name, *id.* at Ex. O).

Both Travelers and Illinois National reserved their rights to recover amounts for which other insurers might be liable.

And there were other potentially liable insurers. At the time of the accident, Ho-Ro and Penske had dual insurance policies on the vehicles that they owned. (Ho-Ro, remember, owned the trailer, and Penske the tractor.) Ho-Ro had a policy from Carolina Casualty Insurance Company ("CCIC") and an excess policy from Lexington Insurance Company ("Lexington"). Penske had both a primary and an excess policy from Old Republic Insurance Company.

CCIC maintains that it does not owe any coverage, and it has not paid out on any claim. It says that to the extent it may have offered to participate in Gardner Bishop's defense, it did so under a reservation of rights. Lexington and Old Republic have not paid out either, although it is not clear that Gardner Bishop or Travelers ever demanded that they provide coverage or defense costs. [ECF No. 90-1, at 9-10]

## A. The Insurance Policies

I now review pertinent terms of the various policies of insurance. I focus on their "other-insurance" provisions, which will affect the allocation of responsibility among the insurers found to owe coverage.

### 1. The CCIC Policy

CCIC issued a "Commercial Transportation Policy" to Ho-Ro as a named insured, with a policy limit of $1 million.[3] (CCIC Policy, Cert. of Deborah Metzger Mulvey, Esq., Ex. H1 [ECF No. 89-17, at 2, 77]). CCIC promised to "pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered auto." CCIC also has "the right and duty to defend any 'insured' against a 'suit' asking for

---

[3]     As explained further below, Penske is named as an additional insured, as required by its agreement to rent the tractor to Ho-Ro.

such damages..." (*Id.* at Truckers Coverage Form p. 2 [ECF No. 89-17, at 19-20]). The CCIC Policy's definitions of "Who Is An Insured" and what is an "auto" are discussed at section III.B.1, *infra*.

The CCIC policy addresses the possibility of separate ownership or coverage of a tractor and trailer. Its coverage

> is primary for any covered 'auto' while hired or borrowed by you and used exclusively in your business as a 'trucker' and pursuant to operating rights granted to you by a public authority. This Coverage Form's Liability Coverage is excess over any other collectible insurance for any covered 'auto' while hired or borrowed from you by another 'trucker.' However, while a covered 'auto' which is a 'trailer' is connected to a power unit, this Coverage Form's liability Coverage is: (1) On the same basis, primary or excess, as for the power unit if the power unit is a covered 'auto'. (2) Excess if the power unit is not a covered 'auto'.

(*Id.* at Truckers Coverage Form p. 11 [ECF No. 89-17, at 28]).

The CCIC other-insurance provision further provides for allocation among primary carriers and among excess carriers:

> When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we pay only our share. Our share is the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

(*Id.*).

## 2. The Travelers Policy

Travelers issued a "Commercial Insurance" policy to Gardner Bishop, providing coverage for bodily injury with a limit of $1 million. (Travelers Policy, Coverage Part Declarations, and General Liability Coverage Form at pp. 5-10, Cert. of Deborah Metzger Mulvey, Esq., Ex. H3 [ECF No. 89-19, at 15, 25-30]).

The Travelers policy's other-insurance provision states: "This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below." [ECF No. 89-19, at 31]. I discuss first the exception to primary coverage in part b. and then the sharing method in part c.

The part b. exception to primary coverage contains one potentially applicable section:

> This insurance is excess over: (1) Any of the other insurance, whether primary, excess, contingent or on any other basis ... (d) If the loss arises out of the maintenance or use of aircraft, 'autos' or watercraft....[4]

[*Id.*]

Where part b. deems coverage to be excess, part b. then sets the limit of that excess coverage:

> [W]hen this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of: (1) The total amount that all such other insurance could pay for the loss in the absence of this insurance; and (2) The total of all deductible and self-insured amounts under all that other insurance.

[*Id.*]

Part c. then sets forth the method of sharing if Travelers' coverage and some other insurer's coverage are both primary:

> If all of the other insurance permit contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of

---

4       This part b. provision applies only "to the extent not subject to Exclusion g. of Section 1." Exclusion g. is irrelevant here; it excludes certain bodily injuries, but none of the type at issue in this case. [ECF No. 89-19 at 24]

insurance or none of the loss remains, whichever comes first. If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

(*Id.*).

### 3. The Illinois National Policy

Illinois National issued a Commercial Excess Liability Policy to Gardner Bishop with a limit of $10 million per occurrence. (Policy Declarations, Cert. of Deborah Metzger Mulvey, Esq., Ex. H4 [ECF No. 89-20 at p. 2]). That policy promised to "pay on behalf of the Insured those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay as damages by reason of liability imposed by law because of Bodily Injury, Property Damage or Personal Injury and Advertising Injury to which this Insurance applies...." (Illinois National Policy at 1 [ECF No. 89-20 at p. 13]). This policy is explicitly excess to the "Retained Limit," *i.e.*, the policy limits of any applicable underlying policies. Applicable policies are listed in an attached schedule, but the list is not intended to be exclusive; also included is any "applicable Other Insurance providing coverage to the Insured." (*Id.* at 24 [ECF No. 89-20 at 36]). The Illinois National policy itself has an "other insurance" provision, which provides that "[i]f other valid and collectible insurance applies to damages that are also covered by this policy will apply excess of the Other Insurance." [ECF No. 89-20, at p. 29]

### 4. The Old Republic Policies

Old Republic issued Penske a Commercial Auto Coverage policy (no. ML 14804 08), covering "all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto'." (Policy at p. 2, Cert. of Deborah Metzger Mulvey, Esq., Ex.

H5 [ECF No. 89-21 at p. 18]). That Old Republic policy has a general limit of $1 million. (Policy Declarations [ECF No. 89-21 at p. 2]).

That Old Republic Policy has an "other insurance" clause, however, that limits its scope:

> If YOU[*i.e.*, Penske] rent or lease an auto to others pursuant to any contract or agreement whereunder there is no provision requiring YOU to provide liability insurance, the insurance afforded by the Policy shall;
>
> (1) not apply to any person or organization other than YOU unless a minimum limit shall be required by state statute; in which case, the limit of our liability is the minimum limit required any compulsory or financial responsibility law with respect to any person or organization other than you.
>
> (2) be excess over other collectible insurance applicable to YOU.

[ECF 93-15, at 6]

Old Republic also issued Penke a second policy (no. MWZX 26522), which provides excess coverage up to $1.5 million per incident. This excess policy fully incorporates the terms and conditions of the underlying primary Old Republic policy. (*See* Policy, Cert. of Deborah Metzger Mulvey, Esq., Ex. H6 [ECF No. 89-22, at 4]). Its coverage is excess to the primary coverage in the underlying Old Republic policy. [ECF No. 89-22, at 3]

### 5. The Lexington Policy

Lexington issued a Commercial Umbrella Liability Policy with a limit of $2 million, naming Ho-Ro as the insured. Lexington's is an excess policy which undertakes to "pay on behalf of the 'Insured' those sums in excess of the 'Retained Amount' that the 'Insured' becomes legally obligated to pay as damages because of 'bodily injury', 'property damages', or 'personal and advertising injury' to which this insurance applies." (Policy at p.1, Cert. of Deborah Metzger Mulvey, Esq., Ex. H2 [ECF No. 89-18 at p. 8]). "Retained amount" means the "total applicable limits of 'scheduled underlying

8

insurance...plus any applicable 'other insurance' providing coverage to the 'Insured.'" (Policy at 18, ¶ W [ECF No. 89-18 at p. 25]). Essentially, then, this policy covers the residue of Ho-Ro's liability after all other applicable policies have exhausted their limits. This Lexington policy specifically names the CCIC policy as 'scheduled underlying insurance' to which the Lexington policy is excess. [*Id.* at Endorsement #004 [ECF No. 89-18 at p. 3]].

The Lexington Policy has an other-insurance provision which states: "If other valid and collectible insurance applies to damages that are also covered by this policy, this policy will apply excess of the 'other insurance.' However, this provision will not apply if the other insurance is specifically written to be excess of this policy." (Policy at 22, ¶ K [ECF No. 89-18 at p. 29]).

## II.   **PENDING MOTIONS**

On September 23, 2009, CCIC filed this declaratory judgment action against Travelers seeking a declaration that CCIC has no coverage obligation in relation to Kanard's injury. [ECF No. 1] CCIC thereafter filed an amended complaint naming the three other potentially implicated insurers (Lexington, Illinois National, and Old Republic). [ECF No. 35] Counterclaims and cross claims followed. Travelers impleaded as third party defendants several additional non-insurer parties: Penske, Kanard, Gardner Bishop, and two Gardner Bishop employees. [ECF No. 4]

Currently before this Court are:

- <u>CCIC's motion for summary judgment</u>. CCIC argues that it issued a policy to Ho-Ro, not Gardner Bishop. Gardner is not its named insured, and CCIC owes no coverage obligation to Gardner under the policy or under any statute. And even if Gardner were CCIC's insured, exclusions in the policy would bar coverage. Coverage of Gardner is also barred by public policy (specifically, that the insurer of the victim or the victim's employer should not have to defend the tortfeasor). In

the alternative, CCIC argues that any coverage it might owe should be shared pro rata among all other applicable policies. [ECF No. 89]. Illinois National and Travelers oppose CCIC's motion. [ECF Nos. 88, 92], Lexington, Ho-Ro's excess insurer, submits a short letter brief in which it supports CCIC's view, minus the pro rata sharing. [ECF No. 91].

- Illinois National's motion for summary judgment. Illinois National argues that CCIC owes coverage to the permissive users of the tractor and trailer, including Gardner Bishop, under the New Jersey "Omnibus" coverage statute. Any policy exclusions that would deny such coverage, it says, are void as against public policy. [ECF No. 87]. Illinois National sets forth a particular view of the relationship among the various insurers' policies and the proper allocation of coverage among them. [*Id.*]. CCIC opposes this motion. [ECF No. 94; *see also* ECF No. 98].

- Travelers' motion for summary judgment. Travelers seeks a declaratory judgment that CCIC owes a primary coverage obligation, including defense and indemnification, to Gardner. CCIC, in Travelers' view, must also reimburse Travelers' costs in defending Gardner. [ECF No. 90]. CCIC opposes this motion. [ECF Nos. 95, 98].

- Penske and Old Republic's motion for summary judgment. These two argue that the tractor leasing agreement between Penske and Ho-Ro made Ho-Ro (and not Penske) responsible for supplying $1 million of primary insurance coverage on the Penske-owned tractor. Old Republic owes, if anything, the statutory minimum coverage of $15,000 per person and $30,000 per occurrence, on an excess basis. Illinois National and CCIC oppose this motion [ECF Nos. 97, 98].

10

## III.   DISCUSSION

### A.   Standard on Motion for Summary Judgment

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

If the moving party meets its threshold burden, the opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial.").

When, as here, the parties file cross-motions for summary judgment, the governing standard "does not change." *Clevenger v. First Option Health Plan of N.J.*, 208 F. Supp. 2d 463, 468-69 (D.N.J. 2002) (citing *Weissman v. U.S.P.S.*,

19 F. Supp. 2d 254 (D.N.J.1998)). The court must consider the motions independently, in accordance with the principles outlined above. *Goldwell of N.J., Inc. v. KPSS, Inc.*, 622 F. Supp. 168, 184 (2009); *Williams v. Philadelphia Hous. Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir. 1994). That one of the cross-motions is denied does not imply that the other must be granted. For each motion, "the court construes facts and draws inferences in favor of the party against whom the motion under consideration is made" but does not "weigh the evidence or make credibility determinations" because "these tasks are left for the fact-finder." *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (internal quotation and citations omitted).

## B.   Does coverage under CCIC's policy extend to Gardner?

A major question that affects all of the pending motions is whether CCIC, as Ho-Ro's insurer for its trucking operation, owes any coverage obligation to Gardner Bishop. The answer depends on (1) whether the CCIC policy, by its terms, covers Gardner Bishop; (2) whether New Jersey's omnibus motor vehicle insurance law ("Omnibus statute"), N.J.S.A. 39:6B-1, requires CCIC to cover Gardner Bishop because it "used" the insured tractor; and, if so, (3) whether certain exclusions in CCIC's policy, public policy, or the Federal Motor Carrier Act, 49 U.S.C. § 10101, nevertheless defeat that statutorily-mandated coverage.

## 1. Does the CCIC policy, by its terms, cover Gardner?

CCIC is correct that Gardner is not expressly or impliedly identified as an "insured" under its policy. Section 1 of the CCIC policy defines an "insured" as follows:

a.  You [*i.e.,* Ho-Ro] for any covered "auto"

b.  Anyone else while using with your permission a covered "auto" you own, hire or borrow except...

12

(4)  Anyone other than your 'employees'…., a lessee or borrower or any of their 'employees' while moving property to or from a covered 'auto'

…

d. The owner or anyone else from whom you hire or borrow a covered 'auto' that is not a 'trailer' while the covered 'auto':

(1) is being used exclusively in your business as a 'trucker'; and

(2) is being used pursuant to operating rights granted to you by a public authority.

(CCIC Policy, Truckers Coverage Form at p. 3 [ECF No. 35-4, at 20]).[5]  The section 1(b)(4) exclusion narrows the class of "users"; it excludes *non*-employees of Ho-Ro who are "moving property to or from" a covered tractor or trailer. The Gardner employees who were loading the trailer were not Ho-Ro's employees, lessees, or borrowers. They fit this exclusion's description; their liability would not be covered because they are, by definition, not "insureds."

That, however, is not the end of the story. For the reasons that follow, the New Jersey Omnibus statute, in combination with an agreement between Penske and Ho-Ro, places certain statutory coverage obligations upon CCIC as Ho-Ro's carrier.

### 2.    Does the New Jersey Omnibus statute impose coverage obligations upon CCIC, whether explicitly or as a result of an agreement?

New Jersey's Omnibus statute provides in relevant part:

"Every owner or registered owner of a motor vehicle registered or principally garaged in this State shall maintain motor vehicle liability insurance coverage…insuring against loss resulting from liability

---

[5]    An "auto" is broadly defined to include "1. A land motor vehicle, 'trailer,' or semitrailer designed for travel on public roads; or 2. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged." (Id. at p. 12). Under Ho-Ro's declarations pertaining to its policy, all "autos" are "covered autos." (See Truckers/Motor Carrier Coverage Form Declarations [ECF No. 35-4, at 16]).

imposed by law for bodily injury, death and property damage sustained by any person arising out of the ownership, maintenance, operation or *use of a motor vehicle...*"

N.J.S.A. 39:6B-1 (emphasis added).

### (a) Tractors, but not trailers, are motor vehicles

The obligations of this statute fall upon the owner or registered owner of a "motor vehicle." Ho-Ro, then, would have been obligated to provide coverage to the extent it was the actual or registered owner of a motor vehicle. A motor vehicle, in turn, is defined to include "all vehicles propelled otherwise than by muscular power, excepting such vehicles as run only upon rails or tracks and motorized bicycles." N.J.S.A. § 39:1-1. That sounds very broad, but a motor vehicle is expressly distinguished from a "motor-*drawn* vehicle" (emphasis added), which "includes trailers, semitrailers, or any other type of vehicle drawn by a motor-driven vehicle." *Id.*

The tractor, which is engine-propelled, meets the definition of a "motor vehicle." Ownership of such a motor vehicle gives rise to coverage obligations under the Omnibus statute. But the owner of the tractor here was Penske; Ho-Ro was merely a lessor, and therefore cannot be liable as an owner or registered owner. Of course, Ho-Ro was the owner of the trailer, but "trailers [and] semitrailers" are defined as motor-*drawn* vehicles. Because the trailer is not a "motor vehicle," Ho-Ro's ownership of it does not give rise to obligations under the Omnibus statute.

### (b) By contract, Ho-Ro took on the statutory insurance obligation of Penske as owner of the tractor

So the tractor is a motor vehicle, but Ho-Ro doesn't own it; Ho-Ro owns the trailer, but it isn't a motor vehicle. That leaves a coverage hole that CCIC could drive a truck through, or so it would seem. It is not Ho-Ro but Penske, as the owner of the tractor, who had the insurance obligation under the New Jersey Omnibus statute. By agreement, however, Ho-Ro took on Penske's

14

insurance obligation and obtained coverage for Penske through CCIC.

The leasing agreement between Penske and Ho-Ro shifted the insurance obligation to Ho-Ro:

> [Ho-Ro] shall, at its sole cost, provide liability coverage *for* [itself] *and* Penske Truck Leasing...in accordance with the standard provisions of a basic automobile liability insurance policy as required in the jurisdiction in which the Vehicle is operated, against liability for bodily injury, including death, and property damage arising out of the ownership, maintenance, use and operation of the Vehicle(s) with limits of at least a combined single limit of One Million Dollars ($1,000,000.00) per occurrence. Such coverage shall be primary and not excess or contributory and shall be in conformity with the motor vehicle minimum financial responsibility laws...

(Vehicle Lease Service Agreement § 8, Cert. of Lawrence F. Citro at Ex. B [ECF No. 93-8]).

And Ho-Ro complied with that leasing agreement by obtaining insurance from CCIC. That liability coverage, as agreed, was "in accordance with the standard provisions of a basic automobile liability insurance policy as required in the jurisdiction in which the Vehicle is operated [*i.e.*, New Jersey] ... [and] in conformity with the motor vehicle minimum financial responsibility laws." The policy that Ho-Ro obtained from CCIC covered both itself *and Penske, as owner.* Penske is expressly named as an additional insured in the CCIC policy. (*See* CCIC Policy, List of Parties Notified, including 'Additional Insured PENSKE TRUCK LEASING CO LP,' Cert. of Citro at Ex. C [ECF No. 93-14 at p. 14]).

The Ho-Ro/Penske agreement thus took the responsibility to obtain the coverage of the tractor required by N.J.S.A. § 39:6B-1 and shifted it from Penske, as "owner," onto Ho-Ro, the lessee. The CCIC policy, which covers the owner of the tractor, must therefore be deemed to comply with the

15

requirements of N.J.S.A. § 39:6B-1. Indeed, under the leasing agreement, that is its function.[6]

### 3.   Did this action arise out of the "use" of the tractor?

A major requirement of the Omnibus statute, N.J. Stat. Ann. § 39:6B-1, is that the owner's insurance cover loss "arising out of the ownership, maintenance, operation or *use of a motor vehicle.*" (Emphasis added.) If CCIC's policy covers Gardner's liability, it must be because Gardner's loading of the trailer constituted "use" of a motor vehicle.[7] That issue breaks down into two questions: (a) Does loading constitute "use"? (b) If so, does loading the *trailer* constitute (or arise out of) the "use" of the *tractor* that is covered by CCIC's policy?

### a. Loading

It is well established that the phrase "use of a motor vehicle" includes the loading of cargo. (Unless otherwise specified, the term "loading" herein includes unloading.) A person injured during the loading of cargo is therefore considered a "user" of the motor vehicle. *See, e.g., Burlington Ins. Co. v. Northland Ins. Co.*, 766 F. Supp. 2d 515, 525 (D.N.J. 2011) (Debevoise, J.) ("Generally, a person injured in the process of unloading cargo from a vehicle is considered a user of the vehicle"); *Pisaneschi v. Turner Constr. Co.*, 345 N.J. Super. 336, 343 (App. Div. 2001) ("Implicit within [New Jersey's omnibus law] is the obligation to provide omnibus liability coverage to all persons who 'use' the named insured's vehicle by participating in its loading or unloading."); *Bellafronte v. General Motors Corp.*, 151 N. J. Super. 377, 382-83 (App. Div. 1977) ("[O]ne who is in the process of unloading cargo from the vehicle is, for the purposes of the omnibus coverage, a user of the vehicle").

---

6      Old Republic's policies are discussed below.

7      It is undisputed that Gardner Bishop did not own, maintain, or operate the tractor (or, for that matter, the trailer).

CCIC acknowledges the broad definitional sweep of that case law, but seeks to distinguish this case on its facts. At oral argument, CCIC contended that the broad definition of "use" has been applied only in cases involving the simple delivery of cargo. Here, CCIC contends, Ho-Ro was going to deliver the concrete barriers, but the loading process remained in the specialized hands of Gardner Bishop. Gardner, which was using its own dedicated loading equipment in its own construction staging area, had full responsibility and control. CCIC states or implies that, under such circumstances, it does not make sense to shift Gardner's responsibility to the insurer of the vehicle.

The rationale of the cases, as I read them, is not so easily confined; their broad sweep is not incidental, but purposeful. The loading/unloading doctrine does not derive from *what* is being loaded, or from the precise *manner* in which loading occurs. Rather, the courts have extended statutory coverage based on the status of the injured *person* as a *user* of the motor vehicle. The only connection required is a "substantial nexus between the injury and the use of the vehicle". *Burlington*, 766 F. Supp. 2d at 525 (quoting *Belafronte*, 151 N.J. Super. at 383). Indeed, that nexus has been stretched to cover injuries incidental to the loading activity itself. *See id.* at 525-26 (finding a substantial nexus where a worker was injured by a wrench that fell from another worker's tool belt even though the wrench was not being used to unload the truck).

That substantial nexus between the injury and the use of the vehicle is enough, and it is present here. Kanard drove the tractor-trailer to Gardner's staging area for the very purpose of loading it with the concrete barriers. Gardner Bishop employees were in the process of loading the trailer when Kanard, who was assisting with the loading, was struck by the falling barrier. That loading activity constituted "use" within the meaning of the Omnibus law; the injury was substantially connected to, and arose from, that "use."

### b. Loading of trailer vs. tractor

Loading, then, is "use." Here, however, it is the trailer, not the tractor, that was being loaded. A question therefore remains as to whether use of the trailer (which is not a motor vehicle) equates to use of the tractor (the motor vehicle to which the coverage requirements of the Omnibus statute apply). N.J. Stat. Ann. § 39:6B-1. No case law settles that point under the New Jersey Omnibus statute. Closely analogous issues have been decided, however, in connection with policy interpretation. Those cases persuade me that the loading of the trailer is inseparable from "use" of the tractor that pulls it.

In *McDonald Indus. v. Rollins Leasing Corp.*, 95 Wn.2d 909, 631 P.2d 947 (1981), for example, liability arose when an 11-ton crane counterweight fell from the trailer portion of a tractor-trailer. The insured had rented the tractor pursuant to an agreement that required him to purchase insurance coverage for liability "arising from the ownership, maintenance or use" of the tractor. (That contractual coverage mandate, of course, speaks in terms very similar to those of New Jersey's statutory mandate in the Omnibus statute.) The Supreme Court of Washington reasoned that the tractor "was being used for the sole purpose for which it had been rented," *i.e.*, pulling the trailer, and that the tractor's use was therefore, "a causative factor in the accident." To put it another way, "the tractor was more than a mere coincidental place in which the injury occurred. Without question its use 'contributed in some way to produce the injury.'" 95 Wn. 2d at 912, 637 P.2d at 949. That court therefore affirmed a ruling that the insurer of the tractor owed coverage for a loading[8] accident in connection with the trailer.

The United States Court of Appeals for the Fifth Circuit gave similarly broad scope to policy language concerning liability "arising out of" the "use" of a tractor:

---

[8]    The policy contained an exclusion for loading and unloading, but the court found it to be ambiguous and did not apply it. 95 Wn. 2d at 912-16, 631 P.2d at 949-51.

The question of which policy provides primary coverage for the liability thus boils down to whether the accident arose out of the use of the tractor, the trailer, or both. We start from the premise that "arising out of," as we said in *Red Ball Motor Freight v. Employers Mut. Liability Ins. Co.*, 5 Cir., 1951, 189 F.2d 374, 378, "are words of much broader significance than 'caused by.' They are ordinarily understood to mean 'originating from,' 'having its origin in,' 'growing out of' or 'flowing from,' or, in short, 'incident to, or having connection with', the use of the car." Reflecting this, nearly every jurisdiction to face the question has held that an accident involving a tractor/trailer unit arises out of the use of both regardless of which part of the unit was actually involved in the accident. *See, e.g., Canal Ins. Co. v. State Auto. Ins. Assoc.*, 5 Cir., 1970, 433 F.2d 373 (Louisiana law); *Insurance Co. of North America v. Royal Indemnity Co.*, 6 Cir., 1970, 429 F.2d 1014; *Smith v. Travelers Indemnity Co.*, 1973, 32 Cal.App.3d 1010, 108 Cal.Rptr. 643; *Ryder Truck Rental, Inc. v. Schapiro & Whitehouse, Inc.*, 1970, 259 Md. 354, 269 A.2d 826; *Hartford Acc. & Indemnity Co. v. Liberty Mutual Ins. Co.*, Fla.1973, 277 So.2d 775. As we stated in *Canal Insurance Co., supra*, at 375, "the tractor and trailer were operated together as a unit, both being under the control, or lack of it, of the driver." *See* Risjord & Austin, 7 Automobile Liability Insurance Cases 9540, where the authors approve the result reached in *Smith, supra*, and state, "Where a truck and towed trailer are involved in an accident, the courts are well-advised to avoid the metaphysics and hold that the accident arose out of the use of each."

*Blue Bird Body Co. v. Ryder Truck Rental, Inc.*, 583 F.2d 717, 726-727 (5th Cir. 1978) (footnote omitted).

The United States Court of Appeals for the Third Circuit, applying Pennsylvania law, adopted *Blue Bird*'s reasoning as an accurate statement of general insurance law:

It is an accepted principle of insurance law that where an accident arises out of the use of a combined vehicle such as a tractor-trailer and where separate policies cover the tractor and the trailer, all insurance applicable to the combined vehicle comes into play,

19

regardless of which part of the rig was physically involved in the accident.

*Contrans, Inc. v. Ryder Truck Rental, Inc.*, 836 F.2d 163, 165-166 (3d Cir. 1987) (citing *Blue Bird, supra*).

That approach is highly persuasive here. To speak of "loading" a tractor is almost meaningless. The tractor/trailer rig functions as a unit—articulated, to be sure, but no different in principle from the unitary front and back halves of a straight truck. I construe the New Jersey Omnibus statute in accordance with those general principles of insurance law. When a tractor is covered by the Omnibus statute, and a trailer is attached to it, the statutory coverage extends to accidents arising from the loading of the trailer.

This accident, then, for purposes of the New Jersey Omnibus statute, is one "arising out of ... use of a motor vehicle." N.J. Stat. Ann. § 39:6B-1. Coverage is therefore required by the CCIC policy, unless some other policy language validly excludes it. I turn to that issue.

### 4.    Do the CCIC policy exclusions operate to defeat the coverage mandated by the Omnibus statute?

CCIC's next contention assumes *arguendo* that its policy is statutorily deemed to cover this accident because it arises from "use" of the tractor. Even if that is so, says CCIC, certain explicit policy exclusions absolve it of liability. I hold that such policy exclusions are void because they are contrary to the Omnibus statute.

The claimed exclusions are as follows:

- The definition of the "insured" excludes "Anyone other than your 'employees'...while moving property to or from a covered 'auto'." [ECF No. 35-4, at 20]

- The "Workers' Compensation" exclusion disclaims coverage for "[a]ny

20

obligation for which the 'insured' or the 'insured's' insurer may be held liable under any workers' compensation, disability benefits or unemployment compensation law." [*Id.* at 21]

- The "Employee Indemnification and Employer's Liability" exclusion disclaims coverage for "[b]odily injury" to an "[e]mployee of the 'insured' arising out of and in the course of: "[e]mployment by the 'insured'; or '[p]erforming the duties related to the conduct of the 'insured's' business." [*Id.* at 21]

- The "Movement of Property by Mechanical Device" exclusion disclaims coverage for "[b]odily injury...resulting from the movement of property by a mechanical device (other than a hand truck) unless the device is attached to the covered 'auto'." [*Id.* at 22]

The New Jersey Omnibus statute invalidates exclusionary language that would effectively deny the very coverage it mandates. In 1990, the New Jersey Supreme Court held that "[b]ecause of statutorily-imposed omnibus requirements, any contractual attempt to exclude coverage for an additional insured will be held invalid." *Ryder/P.I.E. Nationwide, Inc. v. Harbor Bay Corp.*, 119 N.J. 402, 408 (1990) (a loading/unloading case). The Court reaffirmed that holding in 2007, again stating that "a policy exclusion may not override statutory mandates to provide insurance coverage and the attempt to do so in a loading and unloading accident is void." *Potenzone v. Annin Flag Co.*, 191 N.J. 147, 155 (1992).

That general principle settles the issue. Fortifying that conclusion, however, are cases that specifically invalidate the very kinds of exclusions cited here. In *Parkway Iron & Metal Co. v. New Jersey Mfrs. Ins. Co.*, the Appellate Division held that an exclusion identical to CCIC's "Movement of Property by Mechanical Device" was void as against public policy. Its "net effect," said the

21

court, was an impermissible one: "to deprive certain persons or entities of omnibus coverage in certain situations." 266 N.J. Super. 386, 388-91 (App. Div. 1993). In *Burlington, supra,* this district court invalidated a provision identical to CCIC's restriction on who qualifies as an insured, as well as an exclusion similar to CCIC's "Employee Identification and Employer's Liability" clause. Judge Debevoise reasoned that those provisions impermissibly sought to "disclaim coverage required under N.J.S.A. 39:6B-1." 66 F. Supp. 2d at 526. The same reasoning would invalidate the "Workers' Compensation" exclusion. True, Kanard was an employee of Ho-Ro eligible for workers' compensation. But the Omnibus statute requires CCIC to provide coverage, not because Kanard was harmed on the job, but because Gardner "used" the vehicle. The "Workers' Compensation" exclusion would effectively override that statutory mandate, and is therefore void.

In sum, then, the CCIC policy exclusions do not override the coverage required by the New Jersey Omnibus statute.

### 5. Does the Omnibus statute lose its force because its underlying policy of compensation has been satisfied by Gardner's other insurance?

The purpose of the Omnibus statute, says CCIC, is to ensure that victims do not go uncompensated. Here, however, Gardner has ample insurance through Travelers and Illinois National; between them, those two insurers have paid Kanard $5 million. CCIC urges that the compensation policy of the Omnibus statute is therefore satisfied, and that there is no need to impose a mandatory coverage obligation on CCIC.

It is true, of course, that the Omnibus statute is motivated by the "overriding legislative policy of assuring financial protection for the innocent victims of motor vehicle accidents." *Pisaneschi v. Turner,* 345 N.J. Super. 336, 343 (App. Div. 2001). Put differently, the purpose of the Omnibus law is to ensure that innocent victims do not suffer because a vehicle owner failed to obtain insurance. It is also true that Gardner Bishop did *not* fail to obtain

insurance, and that its insurers, Travelers and Illinois National, have compensated Kanard.

From those uncontested facts, however, CCIC draws an implication that is excessive. I do not think the Court may set aside the explicit wording of this statute because its underlying "policy" has fortuitously been vindicated.

CCIC relies primarily on *Connecticut Indem. Co. v. Podeszwa*, 392 N.J. Super. 480 (App. Div. 2007), but the case is distinguishable. *Connecticut Indemnity* held that the Omnibus statute did not bar enforcement of a policy exclusion for claims arising out of the business use of a truck. *Id.* at 486-87. The truck was covered by two complementary policies. The truck's lessee had a policy that covered "all liability claims" arising from business use. *Id.* at 482. The truck's owner had a separate policy that covered all non-business use. *Id.* at 482-83. The owner's policy, which covered non-business use, also explicitly excluded business use. The application of that exclusion, however, was explicitly conditioned on the truck's being covered by "other liability insurance...which provides the minimum kinds of coverage required by law." *Id.* at 483. Thus, even if the owner's policy did not cover a business-related accident, the lessee's "other liability insurance" would cover it. *Id.* at 487. The court found that the parties had purposely provided for seamless coverage of all use—business and non-business—albeit by the mechanism of two policies, rather than one. Thus it held that the Omnibus statute was not offended.[9]

*Connecticut Indemnity* does not stand for the "no harm, no foul" rule proposed by CCIC. There, coverage did not depend on the fortuity of getting in an accident with someone who happened to have adequate business-use insurance. Rather, at the inception, the truck owner and the lessee split the

---

[9]    The court also reasoned that the federal Motor Carrier Act mandates coverage for both business and non-business use. *Id.* at 492-93 (citing 49 U.S.C. § 13906(a)(1)). Thus the parties really had no choice but to provide both kinds of coverage, whether in one policy or two. The Motor Carrier Act is discussed in the next section.

23

responsibility for securing the full range of required coverage. The owner insured the truck for nonbusiness use, and the lessee for business use. The owner policy's exclusion of business use was not an abdication; it reflected only that prearranged division of responsibility, which ensured "continuous insurance coverage." *Id.* at 470.

CCIC's view, if it prevails, will produce an interpretive muddle; the very meaning and scope of the statute will not be ascertainable until we know whether the victim was injured by a tortfeasor with insurance. Perhaps, as a matter of public policy, it would be best if the vehicle owner's insurance were a policy of last resort, applicable only if no other coverage applied. But such a rule cannot be found in or derived from the wording of the statute. Likewise, it may be that one insurer is "enough"—*i.e.,* that the New Jersey legislature has chosen means that, in an individual case, may exceed what is required to meet its goals. But it was entitled to do so; there is no least-restrictive-alternative test for economic legislation, and this Court is not authorized to "improve" a statute to bring about a closer fit between means and ends. I must apply the statute itself, not my impression of its underlying policy.[10]

I will therefore apply the Omnibus statute and invalidate the inconsistent exclusions in CCIC's policy.

---

[10] Thus, for example, it is no defense to my going through a red light that, because I avoided a crash, I vindicated the legislature's underlying "policy" of traffic safety.

CCIC raises one other policy consideration: that requiring coverage would "pose an obvious conflict for [CCIC] by putting it in a position to defend a tortfeasor [*i.e.,* Gardner] against a suit brought by [CCIC]'s policy holder." *See Halifko v. Cities Service Oil Co.,* 510 F. Supp. 1131, 1136-1137 (D.N.J. 1981). Some awkwardness may result when the injured party is the primary insured or its employee. That is not sufficient reason to conclude that the statute means something different from what it says.

### 6.   Does compliance with the federal Motor Carrier Act relieve CCIC of its obligations under the New Jersey Omnibus statute?

CCIC's next argues that its policy exclusions should be upheld, because the policy as a whole complies with the federal Motor Carrier Act (MCA), 49 U.S.C. § 10101 *et seq.*

The MCA "sets forth financial and omnibus coverage requirements for trucks used in interstate trucking operations by 'motor carriers.'" (CCIC Br. at 12)  It ensures that licensed truck operators in interstate commerce cannot avoid financial responsibility for accidents by, for example, leasing rather than owning their vehicles. *See Carolina Cas. Ins. Co. v. Yeates,* 584 F.3d 868, 873 (10th Cir. 2009). The MCA requires that a motor carrier's[11] insurer certify that certain financial responsibility requirements have been met. That certification consists of a special endorsement "sufficient to pay... for each final judgment against the registrant for bodily injury to, or death of, an individual resulting from the negligent operation, maintenance, or use of motor vehicles, or for loss or damage to property ... or both." 49 U.S.C. § 13906(a)(1). That endorsement, known as the MCS-90, must be attached to the motor carrier's liability policy to "provid[e] notice to the general public that [the MCA's financial responsibility requirements] have been met."  Minimum Levels of Financial Responsibility for Motor Carriers, 46 Fed. Reg. 30974, 30978 (June 11, 1981). CCIC duly attached its MCS-90 endorsement to the Ho-Ro policy. (*See* ECF No. 35-4 at p. 62).

CCIC first contends that cases such as *Bellafronte* and *Ryder, supra,* which disallow exclusions inconsistent with the Omnibus statute, have been undercut. They were decided, says CCIC, before "the 1995 enactment" of MCA, and therefore should not be "considered the only authoritative law." (CCIC Br. at 11-12).

---

[11]    A "motor carrier" is not just any vehicle owner, but a "person providing commercial motor vehicle transportation for compensation." 49 U.S.C. § 13102(14).

25

That argument can be dismissed out of hand. The MCA was enacted, not in 1995, but in 1980. *See* 49 U.S.C. § 10101. The MCS-90 endorsement form was promulgated shortly thereafter, in 1981. *See* Minimum Levels of Financial Responsibility for Motor Carriers, 46 Fed. Reg. 30982 (June 11, 1981). Only *Bellafronte, supra* (1977) predates the 1980 statute and regulations. *Ryder, supra* (1990), came ten years after. And even after the 1995 date proposed by CCIC, *Potenzone, supra* (2007) and *Burlington, supra* (2011) invalidated exclusions that purported to disclaim coverage required under the Omnibus statute.

That timing issue aside, I do not accept CCIC's position that its exclusions should be upheld because the policy meets the requirements of the MCA. The nature of CCIC's argument is not entirely clear,[12] but its premise is that the MCA "serves the same mandate" as the New Jersey Omnibus statute. (CCIC Br. 13) I disagree with that premise. The MCS-90 applies only to the liabilities of a *named* insured (like Ho-Ro), not to those of a permissive "user" of the vehicle. *See* 49 C.F.R. § 387.15; *see also Armstrong v. U.S. Fire Ins. Co.*, 606 F. Supp. 2d 794, 823 (E.D. Tenn. 2009) (holding that the "insured" refers only to "the motor carrier named in the policy of insurance"). The MCS-90 is "not intended, and do[es]  not purport, to require a motor carrier's insurer or surety to satisfy a judgment against any party other than the carrier named in the endorsement or surety bond or its fiduciary."  Regulatory Guidance for Forms Used to Establish Minimum Levels of Financial Responsibility of Motor Carriers, 70 Fed. Reg. 58065-66 (Oct. 5, 2005). Unlike the Omnibus statute, the MCS-90 does not mandate coverage for judgments rendered against additional insureds such as "users." It merely creates a suretyship to protect the public from the negligence of the motor carrier itself, "when a lease

---

[12]     CCIC insists this is not a preemption argument. Rather, it contends that the state omnibus law "should not be used to restrict the application of insurance policies" written to comply with the federal requirements like the MCS-90. (CCIC Br. at 12)

agreement might lead to a gap in coverage." *Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 441 (3d Cir. 2006).

The financial guarantee provided by the MCS-90 is a limited one; it does not supplant the mandates of the Omnibus statute. I reject CCIC's argument that compliance with the MCA should override any finding of noncompliance with the New Jersey Omnibus statute.


### C. Coverage Requirements

The upshot of the foregoing discussion is that CCIC owes coverage to Gardner Bishop. I therefore proceed to the issue at the heart of this case: To what extent can Travelers and Illinois National recover from the other insurers, such as CCIC, the settlement payments they made to Kanard? To answer that question, I must determine the allocation, or proper priority, of responsibility among the various parties.

As a general matter, insurance policies may be divided into two levels of coverage: primary and excess. (I refer to the primary and excess coverage as "levels" of coverage.) A primary insurance policy "attaches immediately upon the happening of the occurrence that gives rise to liability." An excess policy "provides protection to an insured for liability for an amount above the maximum coverage provided by the primary policy." *W9/PHC Real Estate LP v. Farm Family Cas. Ins. Co.*, 407 N.J. Super. 177, 196 (App. Div. 2009).

Where more than one policy applies at the same level of coverage, courts look to those policies' "other-insurance" provisions. Such provisions are designed to allocate payouts as among the insurers. *See, e.g., CAN Ins. Co. v. Selective Ins. Co.*, 354 N.J. Super. 369 (2002) (analyzing the relationship

between two primary insurance policies with competing other-insurance clauses).

Other-insurance provisions may be "pro rata" or "excess."  Under a pro rata provision, where more than one insurer is liable for a loss, "the insurer will not be liable for a greater proportion of such loss than the applicable limit of liability in the policy bears to the total applicable limit of liability of all insurance against such loss." *W9/PHC Real Estate LP,* 407 N.J. Super. at 196. A primary policy with an excess other-insurance provision, by contrast, is deemed to be excess; no payment is required unless and until the other primary policy exhausts its limits. *Id.*

Of course, *both* policies may have other-insurance clauses, which must be reconciled. Assume two policies, Policy A and Policy B, at the same coverage level. Where both policies have a pro rata other-insurance clause, there is no conflict: "the policies are not mutually repugnant and each carrier must bear its respective proportionate share of the loss." *Id.* at 199. Where Policy A has a pro rata clause, and Policy B has an excess clause, there is no conflict; the court will give effect to both. *See id.* at 202 (providing the rationale for adopting this "majority rule"). In such a case, Policy A would be primary and Policy B would be excess. But where both policies have excess other-insurance provisions, an Alphonse-and-Gaston cycle ensues, in which each insurer deems itself to be excess and the other to be primary. New Jersey deals with that situation as follows: "the provisions are [deemed] 'mutually repugnant,' and are disregarded"; each insurer is assigned a proportionate share of the loss. *Id.* at 199.

## 1. Priority of Allocation Among Primary Policies

Illinois National and CCIC argue that CCIC, Travelers, and Old Republic[13] are each primarily liable on a pro rata basis, and that each should

---

[13]     Illinois National has released its claims against Old Republic. (ECF Nos. 93-1, 97-2). CCIC still argues, however, that "any coverage owed by Old Republic on a

therefore contribute up to the $1 million limit of its policy. [ECF Nos. 87-1, at 33; 94, at 7-8]  Travelers and Old Republic agree that CCIC is primarily liable. Travelers, however, points to its other-insurance clause, which provides that "[t]his insurance is excess over[] [a]ny of the other insurance…[i]f the loss arises out of the maintenance or use of…'autos[.]'" [ECF No. 90-1, at 21-22] Old Republic maintains that, under its rental agreement with Ho-Ro, its policy is excess and is limited to the $15,000 minimum coverage required by New Jersey law. [ECF No. 93, at 9-11]. None of the parties contend that Illinois National or Lexington is primarily liable.

One issue—whether the CCIC, Travelers, and Old Republic coverage should be deemed primary or excess under their other-insurance clauses—is moot. Each of those three policies has a maximum possible limit of $1 million. Added together, the policies provide, at most, $3 million of coverage, far less than the $5 million settlement amount. If there is coverage under the three policies, it will be exhausted. It therefore makes no difference whether any particular policy's other-insurance provisions are read to require first-dollar pro rata coverage or excess coverage.

The only remaining issue is to confirm that the three policies in question are actually primary[14] and that these three insurers—CCIC, Travelers, and Old Republic—are liable up to their policy  limits.

Travelers asserts that its policy is excess. (ECF No. 90-1, at 21-22) That is true in a sense, but only in a specialized sense. Travelers is referring here to the operation of its other-insurance provision. A true "excess" policy is different from a primary policy that contains an excess other-insurance provision. A true excess policy "*requires* the existence of a primary policy as a condition of

---

primary basis is also owed *pro rata* with other applicable policies." (ECF No. 94, at 7-8). That would remain true even if Illinois, *via* its release, ultimately absorbs the cost.
[14]      "Primary," as I use the term here, applies to any policy at the primary coverage level, even if its other-insurance clause renders it excess vis-à-vis another primary policy. *See infra.*

coverage." *CAN Ins. Co.*, 354 N.J. Super. at 379 (emphasis in original). A primary policy with an excess other-insurance clause, by contrast, provides primary coverage that will become excess only if it turns out that that another primary policy covers the same risk. That "a primary insurance policy … contains an excess 'other insurance' clause does not transform that primary policy into an excess policy." *Id.* at 380. The Travelers policy is not, like a true excess policy, wholly conditioned on the existence of a separate primary policy. For example, there is nothing in the record to suggest that Travelers considered the exhaustion of CCIC's coverage as a factor when it calculated its insurance premium or coverage amount. *See id.* 381-83 (listing the characteristics of a true excess policy). Travelers' coverage has become excess for purposes of this particular accident, but that is incidental. Were it not for the fortuitous presence of other primary insurance, Travelers' coverage would kick in at the first dollar. I therefore find that the Travelers policy is a primary policy.

Old Republic argues that its policy is an excess policy by virtue of Penske's tractor lease agreement with Ho-Ro. That lease agreement requires that Ho-Ro, "at its sole cost, provide liability coverage…which shall be primary and not excess…and be endorsed to include PENSKE TRUCK LEASING as an additional insured." Furthermore, "any liability insurance obtained by PENSKE TRUCK LEASING shall be excess insurance over all insurance obtained by [Ho-Ro]." [ECF 93-8, at 5]

And Penske did obtain its own liability insurance. Penske's primary insurance policy with Old Republic—number ML 14804 08—explicitly addresses the situation where Penske leases out one of its vehicles, and where the agreement (like Ho-Ro's) does *not* require Penske to provide liability insurance:

> d. If YOU [*i.e.*, Penske] rent or lease an auto to others pursuant to any contract or agreement whereunder there is no provisions requiring YOU [Penske] to provide liability insurance, the insurance afforded by the Policy shall;

(1) not apply to any person or organization other than YOU [Penske] unless a minimum limit shall be required by state statute; in which case, the limit of our liability is the minimum limit required any compulsory or financial responsibility law with respect to any person or organization other than you.

(2) be excess over other collectible insurance applicable to YOU [Penske].

[ECF 93-15, at 6, paragraph d]  Old Republic argues that its coverage extends only to the minimum required by statute, which under the New Jersey Omnibus statute is $15,000.

Old Republic is correct. Penske's lease agreement with Ho-Ro requires Ho-Ro to get insurance, and "contains no provisions requiring [Penske] to provide liability insurance." *Id.* Therefore the "limit of [Old Republic's] liability is the minimum limit required by ... law." In New Jersey, that minimum is $15,000. *Id. See Tjong v. Penske Truck Leasing Co., L.P.*, 2006 WL 1574079, at *2.

That other-insurance clause, however, does not transform the Old Republic policy into a true excess policy. The Old Republic policy does not depend for its very existence upon the existence of a primary policy. There is nothing to indicate that its rates or coverage amounts were calculated with the primary CCIC policy purchased by Ho-Ro in mind. As in the case of Travelers, *supra,* I find that the Old Republic policy is a primary policy, albeit one with an excess other-insurance clause. Old Republic is therefore bound, as one of the three primary-level insurers, to pay up to its statutory policy limit.

Accordingly, Travelers and CCIC are obligated up to the limits of their $1 million policies. Old Republic must pay up to its policy limit, set at the statutory minimum of $15,000. Travelers has already paid out in full, exhausting its $1 million policy. The remainder of the $5 million settlement was paid by Gardner Bishop's excess insurer, Illinois National. Therefore CICC

31

must pay its $1 million share, and Old Republic must pay its $15,000 share, to Illinois National. Because Illinois National has released its claims against Old Republic, it has agreed to forgo reimbursement of the $15,000 payment. [ECF No. 97-2] That $15,000 has been satisfied by primary insurance, however, and the obligations of the excess insurers are reduced by that amount.

That disposes of the primary level of coverage, which amounts to $2,015,000 in total. The excess coverage (subject to policy limits) amounts to $5 million minus $2.015 million, or $2.985 million.

## 2. Priority of Allocation Among Excess Policies

The court must next declare the respective obligations of the excess insurers to cover the remaining $2.985 million of liability. There are three potentially responsible excess insurers: Illinois National (excess to the Travelers policy); Lexington (excess to the CCIC policy); and Old Republic (excess to its own primary policy, discussed *supra*).

The Old Republic excess policy is not triggered. That excess policy incorporates all of the terms and conditions of the underlying Old Republic primary policy. One of the terms of that underlying primary policy is that it generally does not apply at all to a third-party lease (like Ho-Ro's) that does not require Penske to obtain coverage. If the particular state requires some minimum level of coverage, then Old Republic is bound to supply coverage only to that extent—here, $15,000. *See* pp. 30-31, *supra*. That $15,000 exhausts the agreed-upon coverage, *see supra*. Old Republic did not agree to supply any further coverage, whether primary or excess.

That leaves Illinois National and Lexington. Both the Illinois National [ECF No. 89-20, at 29] and Lexington [ECF No. 89-18, at 29] policies have excess other-insurance provisions. Those other-insurance provisions will therefore be disregarded as mutually repugnant. *See* W9/*PHC Real Estate LP*, 407 N.J. Super. at 199; discussion at p. 28, *supra*. Accordingly, each insurer is

equally liable for the excess loss within policy limits. *See, e.g., Hanco v. Sisoukraj*, 364 N.J. Super. 41, 47-48 (App. Div. 2003) (apportioning loss equally between insurers with mutually repugnant excess insurance clauses where both policies did not expressly provide for pro rata sharing); *Ambrosio v. Affordable Auto Rental, Inc.*, 307 N.J. Super. 114, 125-27 (App. Div. 1998) (same). The $2.985 million settlement balance will therefore be divided equally between Illinois National and Lexington—$1,492,500 apiece. (Each policy's limit exceeds that amount.) Because Illinois National has already paid the entire excess amount, Lexington must reimburse Illinois National in the amount of $1,492,500.

### D. Remaining Issues

The parties are directed to submit letters within 20 days outlining any issues that must be decided in order for the Court to enter a judgment that is final as to all claims and all parties. These may include fees and costs, as well as any remaining third-party claims, counterclaims, and cross-claims. It would be preferable for the parties to agree upon a form of final judgment that reflects the rulings herein (subject to each party's reservation of its position, of course), but in any event they should attempt to place the court in a position to rule.

## IV. CONCLUSION

The underlying matter was settled for $5 million. CICC owes coverage to Gardner Bishop, a "user" of the covered motor vehicle, up to the $1 million policy limit. Old Republic's coverage is limited to $15,000. Illinois National and Lexington owe excess coverage of $1,492,500 apiece. To that extent, and for the reasons stated above, the motion for summary judgment of CCIC is **DENIED** and the motions for summary judgment of Travelers, Illinois National, Old Republic and Penske are **GRANTED**. Because Travelers paid $1 million and Illinois National paid $4 million of the settlement (while releasing claims

against Old Republic), the parties shall adjust their liabilities by means of reimbursement payments to Illinois National.

An appropriate order will be filed.

HON. KEVIN MCNULTY
**United States District Judge**

Dated: October 22, 2014